IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN McDONALD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. C2:09-CV-0779 |
| v. | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| MT. PERRY FOODS, INC., | : | |
| | : | Magistrate Judge King |
| Defendant. | : | |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiff John McDonald has brought claims under state and federal law against his former employer, Defendant Mt. Perry Foods, Inc., for his allegedly unlawful termination in March 2009. The matter is now before the Court on the Parties' cross-motions for summary judgment (Docs. 17 & 18). For the reasons that follow, the Court **DENIES** the Plaintiff's motion and **GRANTS** in part and **DENIES** in part the Defendant's motion.

### II. BACKGROUND

McDonald worked for Mt. Perry Foods, Inc. ("Mt. Perry") as a truck driver from April 24, 2007, until his discharge on March 16, 2009. While delivering goods to Michigan on June 26, 2008, McDonald's truck went off-road, and he injured his neck and shoulders. The following day, McDonald sought the treatment of Dr. Richard Shaw, a chiropractor with Zanesville Chiropractic. Dr. Shaw took x-rays of McDonald, identified a subluxation of the spine, and began a course of treatment that included manual manipulation of the spine to correct the subluxation. Dr. Shaw treated McDonald continuously through the date of his termination but did not x-ray McDonald's spine after June 27, 2008.

Although Dr. Shaw filed a First Report of Injury with the Bureau of Workers'

Compensation ("BWC") on June 28, 2008, McDonald did not file a formal workers'

compensation claim at the time of his injury. Instead, Mt. Perry paid for McDonald's medical

care out-of-pocket through an internal program in which it paid the first $1,000 of expenses for

work-related injuries directly to keep its workers' compensation premiums low. McDonald

learned of this program from John Largent, Vice President of Operations at Mt. Perry, who was

responsible for authorizing the payments to Zanesville Chiropractic.

     At the initial visit, Dr. Shaw recommended that McDonald take time off of work.

Nevertheless, McDonald did not miss any work from June 26, 2008 until January 5, 2009.

According to McDonald, he was able to work despite his continuing pain because Mt. Perry

accommodated his request for assistance with some of his more arduous tasks. Mt. Perry denies

that McDonald ever asked for assistance due to his injuries or that any assistance was provided.

     In August 2008, McDonald had a conversation with Kay Evans, the office manager and

on-site human resources contact, about the possibility of taking leave. McDonald inquired

whether there was any way for him to take medical leave while receiving full or partial

compensation. McDonald recalls that Evans told him that he could take leave under the Family

and Medical Leave Act; she added that the leave would be unpaid, and Mt. Perry could not

guarantee that his position would be available to him when he returned. Evans recalls, in

contrast, that they spoke about FMLA leave but that they did not talk about whether he would

have a job when he returned. Because the leave was unpaid, McDonald decided not to take it.

     McDonald's condition worsened until, in December 2008, Dr. Shaw and Largent agreed

that McDonald should be placed on light duty. Dr. Shaw faxed a Physician's Report of Work

Ability that stated that McDonald had to avoid bending over and more than occasional twisting,

squatting, or reaching below the knee. On January 5, 2009, McDonald reported for his first day

of light duty, which consisted of scooping cookies onto cookie sheets. McDonald discovered that

the assignment required him to bend over a 3-foot table, to twist while placing the cookie sheet into a rack, and to stoop to place the trays onto the bottom levels of the rack. According to McDonald, the assignment caused him a severe headache and pain in his shoulders and neck.

McDonald called his chiropractor, but neither Dr. Shaw nor his partner, Dr. David Black, who also occasionally treated McDonald, was available. McDonald spoke instead with Stephanie Stackhouse, who scheduled McDonald for an appointment on the following day. Before McDonald left Mt. Perry around noon, he tried to locate his light-duty supervisor or Largent but was only able to speak with Tina Monroe, Transportation Supervisor for Mt. Perry, and Evans. According to McDonald, he told Monroe and Evans that he was leaving work on his chiropractor's advice. Monroe and Evans admit that they spoke with McDonald about his decision to leave early but deny that he told them that he was leaving because of his injury. Regardless, Largent has testified that he learned that day that McDonald had called his chiropractor before leaving. Later that afternoon, Dr. Black, on behalf of Dr. Shaw, faxed Mt. Perry a note excusing McDonald from work from January 5, 2009 through February 5, 2009.

McDonald claims that he communicated with Mt. Perry several times and through several different channels during the period he was on leave. According to McDonald, Dr. Black faxed a note to Mt. Perry on February 3, 2009 excusing McDonald from work from February 6, 2009 until March 6, 2009. On March 4, 2009, Dr. Black extended McDonald's leave for another month, or until April 8, 2009. Dr. Shaw completed a Physician's Report of Work Ability that released McDonald to return to work without restrictions as of March 13, 2009; Evans received this form at Mt. Perry on March 13, 2009.

McDonald also alleges that he spoke with Monroe and Evans during the period he was absent from work. He claims that he spoke with Monroe on three separate occasions about his medical status, about returning his rented uniform, and about his return to work, respectively.

During his conversation with her about his return to work, conducted over the phone on March 13, 2009, Monroe told him that she would contact him about his assignment and where he should report for duty. McDonald claims that he spoke with Evans four times about topics including his medical status, insurance, the uniforms, and the date of his expected return.

Mt. Perry challenges most of these allegations. According to Mt. Perry, McDonald's original return-to-work date of February 5 passed without any communication from McDonald. Nor do Monroe or Evans support most of McDonald's claims. Monroe states, in an affidavit attached to the Defendant's response to the Plaintiff's motion, that she spoke with McDonald once about his final paycheck. She continues that she subsequently tried to contact him several times but that he did not return her messages. Evans likewise states, in an affidavit attached to the Defendant's response to the Plaintiff's motion, that she did not talk with McDonald about his medical status or his return to work. She claims that she spoke with McDonald's girlfriend once about health insurance and to either McDonald or his girlfriend once about the return of McDonald's uniform and company keys.

On Monday, March 16, 2009, McDonald received a letter of termination from Largent. The letter, dated March 17, 2009, communicated that Mt. Perry hired a replacement driver after it received McDonald's chiropractor's fax excusing him from work for one month. His position, therefore, was no longer open, and his discharge was effective March 16, 2009. Employee records reflect that Mt. Perry hired a new driver on January 12, 2009.

Meanwhile, McDonald initiated a workers' compensation claim with the BWC. He filed his formal claim on January 5, 2009 and filed an application for temporary total disability on January 15, 2009. The BWC denied his claim on January 29, 2009; McDonald appealed. While pursuing his claim with the BWC, McDonald submitted a report dated June 30, 2009 from Dr. Shaw indicating that the dates of McDonald's disability were January 6, 2009 through July 30,

2009. Ultimately, McDonald settled the claim with Mt. Perry on July 29, 2010.

McDonald filed his complaint in this Court against Mt. Perry on September 4, 2009, alleging the following claims: (1) violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; (2) violation of the anti-retaliatory provision of the Ohio Workers' Compensation Act, Ohio Rev. Code Ann. § 4123.90; and (3) violation of Ohio public policy. McDonald and Mt. Perry each moved for summary judgment on all counts on December 15, 2009. The Court heard oral argument on the motions, and the matter is now ripe for decision.

## III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. But the non-moving party "may not rest merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The standard of review for

cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). The Court "must evaluate each party's motion on its own merits" and may not grant "summary judgment in favor of either party . . . if disputes remain as to material facts." *Id.*

When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id.*

### IV. LAW AND ANALYSIS

#### A. Department of Labor Regulations

The FMLA obliges the Secretary of Labor to enact regulations necessary to the implementation of the FMLA. 29 U.S.C. § 2654. Courts applying the FMLA are bound by these regulations so long as they are not arbitrary, capricious, or manifestly contrary to the statute. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002); *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1164 n.5 (N.D. Ohio 1997). The Secretary issued the first set of final regulations on January 6, 1995 with an effective date of February 6, 1995. Family and Medical Leave Act of 1993, 60 Fed. Reg. 2180, 2180 (Jan. 6, 1995) (hereinafter "1995 Regulations"). The Secretary amended these regulations on November 17, 2008 with an effective date of January 16, 2009. Family and Medical Leave Act of 1993, 73 Fed. Reg. 67934, 67934 (Nov. 17, 2008) (hereinafter "2009 Regulations").

The regulations are not intended to be applied retroactively, and this Court will not do so. One district court in this Circuit has reached the same conclusion on the basis of *Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109 (6th Cir. 1997). *Mason v. Steelcraft, Inc.*, No. C-1-07-584, 2009 U.S. Dist. LEXIS 18821, at *26-27 (S.D. Ohio Mar. 10, 2009). In *Bauer*, the

Court of Appeals held that the 1995 Regulations were not to be applied retroactively: "Because the FMLA's grant of authority to the Secretary of Labor to promulgate regulations, 29 U.S.C. § 2654, does not affirmatively grant her the authority to make those regulations retroactive, and because the final regulations themselves do not provide any indication that they are to be applied retroactively, we believe that the final regulations do not govern this case." *Bauer*, 118 F.3d at 112 n.1. As in the 1995 change to the regulations, the current amendments do not state that they are to be applied retroactively, and the Court concludes consistently with *Bauer* that the 2009 Regulations are not to be applied retroactively.

The remaining question is which regulations govern: those in effect when the Plaintiff took his leave on January 5, 2009, or the regulations in effect when the Defendant fired the Plaintiff on March 16, 2009. The parties cite only to the 1995 Regulations, those that were in effect on January 5, 2009, when the Plaintiff took his leave, but do not address the issue of retroactivity. Although this Court is not aware of any case in which events occurred both before and after the effective date of new FMLA regulations, most other courts have referred to the date of termination as the controlling one. *See Olsen*, 979 F. Supp. at 1164 n.6 ("[T]he interim regulations apply here because Olsen's termination occurred prior to the release of the final regulations, which are not to be given retroactive effect."); *Haefling v. UPS*, 169 F.3d 494, 498 (7th Cir. 1999) (applying FMLA regulations in effect on date of termination); *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 761 n.2 (5th Cir. 1995) ("[T]he interim regulations govern this dispute since Westlake's decision to suspend Manuel in December 1993 occurred prior to the release of the final regulations."); *Dalton v. Geico Annuity & Ins. Co.*, No. 7:08-CV-130, 2010 U.S. Dist. LEXIS 64188, at *24 (M.D. Ga. June 28, 2010) (applying FMLA regulations in effect on date of termination). *But see Schlett v. Avco Fin. Servs.*, 950 F. Supp. 823, 835 (N.D. Ohio 1996) (applying the regulations concerning notification that were in effect

when employee applied for leave); *Robbins v. Bureau of Nat'l Affairs*, 896 F. Supp. 18, 22

(D.D.C. 1995) (same). The Court will accordingly apply the 2009 Regulations to the Plaintiff's

claim but notes that its conclusions would be the same under either set of regulations.

## B. FMLA

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave

each year if, among other things, an employee has "a serious health condition that makes the

employee unable to perform the functions of the position of such employee." 29 U.S.C. §

2612(a)(1)(D). The Sixth Circuit recognizes "two distinct theories of recovery under the FMLA:

(1) the 'entitlement or interference' theory arising under 29 U.S.C. § 2615(a)(1); and (2) the

'retaliation' or 'discrimination' theory arising under 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of

Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Under an interference theory, "[i]t shall be

unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Under a retaliation

theory, "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate

against any individual for opposing any practice made unlawful by this title." 29 U.S.C. §

2615(a)(2). Entitlement/interference claims are based on prescriptive rights, which establish

entitlements to employees and set floors for employer conduct, while retaliation claims are based

on proscriptive rights, which prohibit disparate employer conduct with regard to employees

taking leave. *Taylor v. The Union Inst.*, 30 F. App'x 443, 452 (6th Cir. 2002).

The Plaintiff has alleged that the Defendant violated his rights under both an interference

theory and a retaliation theory. In particular, the Plaintiff contends that he is entitled to recovery

under the interference theory based on the Defendant's failure to reinstate the Plaintiff to his

prior position upon his return from FMLA-qualified leave and to recovery under the retaliation

theory for the Defendant's termination of the Plaintiff, which the Plaintiff alleges occurred in

retaliation for exercising his right to FMLA-qualified leave. The Parties have both moved for summary judgment on each of these theories.

## 1. Interference Theory

In order for the Plaintiff to succeed on his FMLA interference claim under § 2615(a)(1), he has the burden of establishing the following facts, in existence at the time his claim arose: (1) he was an FMLA-eligible employee; (2) the Defendant was an FMLA employer; (3) the Plaintiff was entitled to leave under the FMLA; (4) the Plaintiff gave the Defendant notice of his intention to take leave; and (5) the Defendant used the leave against the Plaintiff in an unlawful manner, as provided in either the statute or regulations. *See Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)). Each element must be proved by a preponderance of the evidence. *Id*. (citing *Sorrell v. Rinker Materials Corp*., 395 F.3d 332, 335 (6th Cir. 2005)).

The Defendant challenges the Plaintiff's interference claim on the third, fourth, and fifth elements. The Defendant argues that the Plaintiff was not entitled to leave under the FMLA (the third element) for the following two reasons: (1) the Plaintiff's chiropractors were not "health care providers," and the Plaintiff therefore did not suffer a "serious health condition"; and (2) he was not written off work as a result of a medical assessment by a qualified medical provider. It additionally argues that the Plaintiff did not give notice of his intention to take leave (the fourth element), and that the Defendant did not use the Plaintiff's leave in an unlawful manner because the Plaintiff did not and was not able to return to work after he was cleared by his chiropractor (the fifth element).

### a. Whether the Plaintiff Was Entitled to Leave Under the FMLA

*i. Whether the Plaintiff's Chiropractors Were "Health Care Providers"*

The Parties agree that the Plaintiff may only recover under the FMLA if he has a "serious

health condition," 29 U.S.C. § 2612(a)(1)(D), defined as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider," 29 U.S.C. § 2611(11)(B). The term "health care provider" includes "any other person determined by the Secretary [of Labor] to be capable of providing health care services." 29 U.S.C. § 2611(6)(B). The Secretary of Labor's 2009 Regulations clarify that chiropractors are only deemed to be "health care providers" when providing "treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist." 29 C.F.R. 825.125(b)(1).[1]

There is uncontroverted evidence in the record that the Plaintiff's chiropractors, Dr. Shaw and Dr. Black, x-rayed the Plaintiff in June 2008, diagnosed him with subluxation of the spine, and treated him with manual manipulation of the spine from June 2008 through the summer of 2009. The question before the Court is whether a chiropractor who excused an employee from work six months after taking the only x-ray showing a subluxation of the spine is a "health care provider" within the meaning of the FMLA.

The conclusion the Defendant urges upon this Court—that chiropractors are only "health care providers" if they substantiate the existence of a subluxation of the spine at the time that the employee takes leave—finds no support in the statute, its interpretive regulations, or the case law. On the face of the 2009 Regulations, there are three necessary conditions for a chiropractor to be a FMLA "health care provider": (1) that he take an x-ray of the employee; (2) that the x-ray reveals a subluxation of the spine; and (3) that he treats the employee for that subluxation through manual manipulation of the spine. *See* 29 C.F.R. 825.125(b)(1). The conditions for

---

[1] The 2009 Regulations did not modify any relevant aspect of the 1995 regulations, and the Court's conclusion would be the same under either version. *Compare* 2009 Regulations, 73 Fed. Reg. at 68083 *with* 1995 Regulations, 60 Fed. Reg. at 2245.

satisfying the definition of a "health care provider" simply do not include a temporal relationship between the x-ray and the authorization of leave, and the Court can discern no basis for concluding that a chiropractor once qualified as a "health care provider" should cease to be so merely through the passage of time. In this case, the Plaintiff's chiropractors took an x-ray of his spine, diagnosed a subluxation on the basis of that x-ray, and then treated him for the subluxation through manual manipulation of his spine. Although the treatment spanned several months, there is no evidence that the manual manipulation of his spine was ever for anything other than the subluxation. The evidence in the record therefore meets all of the statutory criteria for finding that a chiropractor is a "health care provider."

The Defendant attempts to support its position with *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1166–68 (N.D. Ohio 1997), and *Silcox v. Via Christi Okla. Reg'l Med. Ctr.*, 196 F. App'x 658, 660 (10th Cir. 2006) (unpublished). These cases do not bolster the Defendant's argument because the issue before those courts was not the *timing* but rather the *existence* of x-rays demonstrating a subluxation of the spine. In *Olson*, the district court concluded that the plaintiff's chiropractor was not a "health care provider" because the chiropractor had neither performed a manual manipulation of the plaintiff's spine nor taken an x-ray that revealed a subluxation. *Olson*, 919 F. Supp. at 1166-67. The plaintiff, therefore, had "not established that a qualifying 'health care provider' made an assessment of his or her condition and concluded that proper treatment of that condition 'required' the employee's absence from work for over three days," and the court granted the defendant summary judgment. Similarly, the Court of Appeals in *Silcox* affirmed the district court's dismissal of the plaintiff's claim because the plaintiff's chiropractor did not take x-rays of the plaintiff's spine and consequently "was not a health care provider within the meaning of the FMLA." *Silcox*, 196 F. App'x at 660.

For the reasons stated, the Court concludes that there is no genuine dispute of material

fact that the Plaintiff was treated by a "health care provider" within the meaning of the FMLA.

*ii. Whether The Plaintiff Has Shown That His Absences Were Caused By His Incapacity*

The Defendant contends that it is entitled to summary judgment because the Plaintiff has failed in two distinct ways to prove that the leave he took beginning on January 5, 2009 was caused by his injury. Neither contention has merit.

In order for the Plaintiff to prove that he had a "serious health condition," he has to show that he was undergoing "continuing treatment" as defined in C.F.R. § 825.115. *See* 29 U.S.C. § 2612(a)(1)(D) (entitlement to leave for a "serious health condition"); 29 U.S.C. § 2611(11)(B) (defining "serious health condition" as a condition involving "continuing treatment by a health care provider"); 29 C.F.R. § 825.113(a) (defining "serious health condition" and referring to § 825.115 for definition of "continuing treatment"). The interpretive regulations provide several means of demonstrating "continuing treatment," only one of which is relevant here.[2] 29 C.F.R. § 825.115(c) reads as follows:

> (c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
> > (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
> > (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> > (3) May cause episodic rather than a continuing period of incapacity (e.g. asthma, diabetes, epilepsy, etc.).

---

[2]29 C.F.R. § 825.115 also defines "a serious health condition involving continuing treatment by a health care provider" as including the following: "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition"; periods of incapacity due to pregnancy or prenatal care; periods of incapacity from a "permanent or long-term . . . condition for which treatment may not be effective"; and absences for treatments following restorative surgery or another condition likely to result in a period of incapacity lasting more than three consecutive days in the absence of medical intervention.

The regulations define "incapacity" as the "inability to work, attend school or perform other regular daily activities *due to* the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b) (emphasis added). It is from the definition of "incapacity" that the requirement of a causal relationship between the incapacity and the serious health condition arises.

The Defendant first argues that it is entitled to summary judgment because neither the Plaintiff's decision to leave work on January 5 nor Zanesville Chiropractic's faxed note excusing the Plaintiff from work were made after consultation between the Plaintiff and his chiropractors. Hence, the Defendant concludes, no health care provider assessed the Plaintiff's condition and determined that he needed to be absent from work. The Defendant again relies on *Olsen* for support. In *Olsen*, the court held that, under the regulations in effect at the time,[3] an employee-plaintiff had to show a causal connection between his incapacity and his absence from work. *Olsen*, 979 F. Supp. at 1165. That causal connection, the court continued, was only satisfied if the employee "was prevented from working *because* of the injury or illness based on a medical provider's assessment of the claimed condition." *Id*. at 1166. The employee could "establish that he was required to be absent from work only if he produce[d] evidence showing that a 'health care provider' made a professional assessment of his condition and determined, based on that assessment, that an extended absence from work was necessary." *Id*.

Defendant's reliance on *Olsen* is misplaced. *Olsen* stands for the proposition that employees must supply more than their own say-so to prove the existence of a "serious health

---

[3]The *Olsen* court was applying the following definition of a "serious health condition": (2) Any period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calender days, that also involves continuing treatment by (or under the supervision of) a health care provider[.]
Family and Medical Leave Act of 1993, 58 Fed. Reg. 31794, 31817 (June 4, 1993).

condition." *See id.* at 1166 (warning of the dangers of an interpretation that would allow an employee to defeat summary judgment with no more than "a note from a spouse, parent, or even one's own claim that one cannot work because of illness").[4] The Plaintiff has provided such proof in the form of the deposition testimony of his two chiropractors and the leave forms that they filled out on his behalf.

Nor is the Defendant's argument that the Plaintiff must have had a health care provider assess his condition *prior to* leaving work on January 5 supported by the law. As acknowledged in *Olsen*, a medical determination that an employee's illness requires leave "need not be made at any particular stage of the illness or at any particular point post-injury." 979 F. Supp. at 1166 n.11; *see also Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 863 (8th Cir. 2000) ("There is no requirement in the statute that an employee be diagnosed with a serious health condition before becoming eligible for FMLA leave. . . . As a matter of common sense, moreover, it seems to us that an employee who falls and breaks a leg while on the job should not be required to attempt to keep working (and be subject to termination for failure to do so or even for failure to perform some tasks up to standard) until a doctor arrives and excuses him or her."). The evidence shows that the Plaintiff's chiropractors had requested that the Plaintiff perform only light duty as a result of their evaluation of his worsening medical condition. On January 5, 2009, Dr. Black faxed the Defendant a form requesting leave for the Plaintiff from January 5 through February 5. Then, on January 6, 2009, the Plaintiff met with one of his chiropractors, and the

---

[4]The Sixth Circuit has not yet answered whether evidence of incapacitation must come from a medical professional or whether lay testimony is sufficient. Other Circuits that have spoken on this issue all concluded, in contrast to the district court in *Olsen*, that "lay testimony can create a genuine issue of material fact regarding incapacitation." *Schaar v. Lehigh Valley Health Servs.*, 598 F.3d 156, 159 (3d Cir. 2010) (collecting cases). The Court takes no position on this debate because, as stated *infra*, the Plaintiff provided medical evidence causally linking the Plaintiff's serious health condition with his incapacity.

inference can be made that the chiropractor's evaluation of the Plaintiff on that date did not cause the chiropractor to withdraw the earlier request for leave. This is sufficient evidence that a "health care provider" determined, based upon personal knowledge of the Plaintiff's medical status, that the Plaintiff's injury necessitated leave from work beginning January 5, 2009.

The Defendant's second challenge to this prong of the Plaintiff's claim is similarly without merit. The Defendant contends that the Plaintiff did not leave work because of his illness but because the Defendant refused to accommodate his work restrictions. In *Bradley v. Mary Rutan Hosp. Assoc*., 322 F. Supp. 2d 926, 929 (S.D. Ohio 2004), an employee injured her hand on August 28, 2001 and sought medical treatment for that injury on August 29, 2001. At that time, her doctor authorized her to return to work so long as she did not use her injured hand. *Id*. The employee had a follow-up appointment with her doctor on September 4, 2001, during which she told the doctor that her employer had refused to accommodate the doctor's restrictions. *Id*. at 930. The doctor consequently took the employee off work until September 25, 2001. *Id*. The court concluded that "to the extent that [the employee] was 'incapacitated' or 'unable to work' for more than three days, it still was not because of her injury; rather it was because she told [her doctor] that [her employer] refused to accommodate her work restrictions." *Id*. at 942-43. The employee therefore had not shown that she was incapacitated by her injury, and the court granted the employer summary judgment. *Id*. at 943.

*Bradley* is not binding upon this Court and is factually distinguishable from this case. In *Bradley*, the employee admitted that the only reason that her doctor authorized her leave was because the employee had claimed that her employer was refusing to accommodate her restrictions. The Plaintiff's doctor in this case has testified otherwise, explaining during deposition that he placed the Plaintiff on leave based on "the severity of his condition at that time." This statement is verified by the leave form, which claims the reason for the requested

leave is "severe neck pain."[5]

For the reasons stated, the Defendant's challenges to the Plaintiff's evidence do not entitle it to summary judgment. At the same time, the Plaintiff is not entitled to summary judgment because a question of fact remains as to whether the Plaintiff's absence from work (the "period of incapacity") was "due to" his "serious health condition" or to the Defendant's inability to abide by the chiropractor's restrictions. *See* C.F.R. § 825.115; *Bradley*, 322 F. Supp. 2d at 942–43. The evidence that the Plaintiff's chiropractors placed him on leave because of his pain is not uncontroverted. The original leave form stated that the leave request was because of the Plaintiff's "severe neck pain" and because the "employer did not comply" with the chiropractor's previous restrictions. Dr. Black's treatment notes, too, indicate both the Plaintiff's increasing pain *and* the employer's inability to follow the restrictions as the reasons for taking the Plaintiff off of work. For this reason, summary judgment cannot be granted to either Party on this prong of the Plaintiff's FMLA claim.

### b. Whether the Plaintiff Gave Adequate Notice to the Defendant

#### *i. Initial Notice*

The Defendant argues that it did not have notice that the Plaintiff intended to take FMLA leave because in August 2008, the Plaintiff refused Kay Evans's suggestion that he take FMLA leave for his injuries from the June 2008 crash. In light of this refusal, the Defendant continues, it did not have notice that the Plaintiff intended to take FMLA leave despite the fact that Largent admitted he knew the Plaintiff left work on January 5 on the advice of his doctors and despite the

---

[5]There are two January 5, 2009 leave forms. The first stated that Dr. Black was taking the Plaintiff off of work because the "employer did not comply" with the chiropractor's restrictions and because of "severe neck pain." Largent faxed a letter to Zanesville Chiropractic requesting that the statement that it did not comply with the work restrictions be removed from the form as inaccurate, and Dr. Black sent a revised form stating that the only reason for the leave was "severe neck pain."

fact that it received a leave form from Zanesville Chiropractic placing the Plaintiff on leave for one month.

The Defendant's argument flies in the face of the law, which holds that "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Walton v. Ford Motor Co.,* 424 F.3d 481, 486 (6th Cir. 2005); *see also* 29 C.F.R. § 825.302(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."); 29 C.F.R. § 825.303(b) (same).[6] The Defendant knew that the Plaintiff's condition had worsened, evidenced by the fact that it put him on light duty; knew that the Plaintiff left work on January 5, 2009 after calling his chiropractor's office; and knew that the Plaintiff's chiropractor thought that he could not work from January 5 to February 5 because he was experiencing "severe neck pain." These are sufficient facts from which a jury could conclude that a reasonable employer would have been apprised of the Plaintiff's need to take time off for a serious health condition, and the Defendant's motion cannot be granted on this prong.

### ii. Continuing Notice

The Defendant additionally argues that the Plaintiff failed to provide notice that he needed an extension of his initial leave period. *See Morr v. Kamco Indus.*, 548 F. Supp. 2d 472, 478 (N.D. Ohio 2008) ("Once the employee is on leave, an employer may require such employee 'to report periodically on the employee's status and intent to return to work.'") (quoting 1995 Regulations, now codified at 29 C.F.R. § 825.311(a)); *see also* 29 C.F.R. § 825.302 ("[N]otice

---

[6]The 2009 Regulations are not different from the 1995 Regulations in any way that affects the outcome of this case. *See* 2009 Regulations, 73 F.R. at *68000–68009, 68030 (describing the modifications to what are now §§ 825.302, 825.303, & 825.11).

need only be given one time, but the employee shall advise the employer as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown.").

The Defendant's argument fails because there is evidence in the record from which a reasonable jury could conclude that the Plaintiff provided the Defendant continuing notice of his status and need for extended leave. The Plaintiff has testified that he spoke about his anticipated return-to-work date with both Tina Monroe and Kay Evans during his leave, and he has provided copies of leave forms faxed by his chiropractors to the Defendant indicating extensions of his leave.[7] The Defendant alleges that the Plaintiff never spoke about his leave dates with either Monroe or Evans, and it challenges the evidence that it ever received the leave forms. These are factual disputes for the jury, and both Parties' motions on the notice prong must be denied.

### c. Whether the Plaintiff Was Able To Return to Work at His Prior Position

The Defendant argues that it did not deny the Plaintiff "'FMLA benefits to which he was entitled'" because the Plaintiff's continuing disability eliminated his right to reinstatement. *Wysong*, 503 F.3d at 447 (quoting *Cavin*, 346 F.3d at 719). According to the 2009 Regulations, "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA." 29 C.F.R. 825.216(c).[8]

---

[7]The Defendant argues that the February 3, 2009 and March 4, 2009 leave forms are inadmissible because the Plaintiff first produced them during depositions of the Defendant's employees. Under Fed. R. Civ. P. 37(c), the failure to disclose documents results in the offending party's inability to use those documents to support a motion "unless the failure was substantially justified or is harmless." Since the Plaintiff produced the leave forms during the depositions in October 2010, the Defendant has had time to investigate them before the summary judgment motions were filed in December 2010, and the failure to disclose them earlier is harmless.

[8]The 1995 Regulations similarly provided that an employee has no right to restoration of his former position if he "is unable to perform an essential function of the position because of a

The Defendant points to evidence that the Plaintiff, by his own admission and those of his chiropractors, was totally disabled as of March 13, 2009; the Plaintiff, therefore, could not have been entitled to reinstatement, and the Defendant's decision to fire him did not interfere with his FMLA rights. At the time of his termination, the Plaintiff was pursuing a workers' compensation claim in which he asserted that he was totally disabled. *See Ohio Rev. Code Ann.* § 4123.56; *State ex rel. Ramirez v. Industrial Com.*, 69 Ohio St. 2d 630, 631 (Ohio 1982) ("[T]emporary total disability as used in R.C. 4123.56 [is] a disability which prevents a worker from returning to his former position of employment[.]"). The Plaintiff's chiropractors, moreover, asserted in a June 30, 2009 affidavit submitted in connection with the Plaintiff's workers' compensation claim that the Plaintiff was totally disabled from January 5, 2009, through July 30, 2009. The Plaintiff retorts that the March 13, 2009, return to work slip that Dr. Shaw completed on the Plaintiff's behalf demonstrates that he was able to return to work at that time and that his arguments before the BWC do not estop him from asserting his entitlement under the FMLA.

The Defendant's challenge must be considered in light of the Supreme Court's holding in *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795 (1999). In that case, the Supreme Court held that an employee who had applied for or received Social Security Disability Insurance ("SSDI") benefits under the Social Security Act ("SSA") was not estopped from pursuing a claim under the Americans with Disabilities Act ("ADA"). 526 U.S. at797. Setting aside the situation where an employee makes contradictory factual assertions in two proceedings, the Court reasoned that an employee could both be "too disabled to work" for the purposes of

---

physical or mental condition, including the continuation of a serious health condition." 1995 Regulations, 60 Fed. Reg. at 2253. The Court's conclusion would therefore be the same under either version of the regulations.

SSDI benefits and still able to "perform the essential functions" of her job with "reasonable accommodation" for the purposes of the ADA. *Id.* at 802, 797–98. That is, the claims that "I am too disabled to work" and "I am able to work with reasonable accommodations" do not "inherently conflict to the point where courts should apply a special negative presumption" against a subsequent ADA claim. *Id*. at 802. At the same time, the apparent contradiction between the employee's positions in the two contexts demands that the employee "proffer a sufficient explanation." *Id*. at 806. At the summary judgment stage, that explanation "must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the [employee's] good faith belief in, the earlier statement, the [employee] could nonetheless 'perform the essential functions of her job, with or without 'reasonable accommodation.'" *Id*. at 807.

*Cleveland* concerned the conflicts between the SSA and the ADA. The Court's analysis must therefore proceed in two parts. First, the question is whether *Cleveland*'s holding is applicable to this case, which involves the FMLA and workers' compensation law. Second, the question is whether the Plaintiff's representations in his workers' compensation case warrant granting summary judgment to the Defendant under the rule in *Cleveland* or otherwise. The Court concludes, first, that *Cleveland*'s holding is applicable to this case and, second, that the Plaintiff has not proffered a sufficient explanation for her contradictory representations.

Federal courts around the country have applied *Cleveland*'s framework to conflicts arising from statutes other than the ADA and the SSA. *E.g. McClaren v. Morrison Mgmt. Specialists, Inc*., 420 F.3d 457, 463 (5th Cir. 2005) (state law age discrimination claim and SSDI claim);*Williams v. London Util. Comm'n*, 375 F.3d 424, 429 (6th Cir. 2004) (ADA claim and state disability claim); *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 7 (2d Cir. 1999) (ADA claim and workers' compensation and social security claims); *Desmond v. Yale-New*

*Haven Hosp., Inc.*, 738 F. Supp. 2d 331, 345 (D. Conn. 2010) (ADA claim and workers'
compensation claim); *Mahoney v. Ernst & Young, LLP*, 487 F. Supp. 2d 780, 812 (S.D. Tex.
2006) (ADA claim and application for private disability benefits). *But see Webb v. Md. Dep't of
Health & Mental Hygiene*, Case No. RDB 04-387, 2006 U.S. Dist. LEXIS 71135, at *44 (D. Md.
Sept. 14, 2006) (declining to apply *Cleveland* to case involving contradiction between FMLA
and SSDI claims). This Court is persuaded by these cases that *Cleveland* applies generally  to
conflicts between claims for benefits and claims for damages, not just to conflicts between the
SSA and the ADA. So, too, has the Sixth Circuit concluded in *Verhoff v. Time Warner Cable,
Inc*., 299 F. App'x 488, 497-98 (6th Cir. 2008) (unpublished). In that case, the Court of Appeals
considered whether an employee-plaintiff had satisfied the prima facie elements of his FMLA
interference claim when that employee was also receiving SSDI benefits. The court held that
"*Cleveland*'s logic extend[ed] to the apparent tension between [the employee's] FMLA-
interference claim and his receipt of SSDI benefits;" because provisions of the FMLA have the
same effect as the "reasonable accommodation" language in the ADA, there was no "inherent
conflict" between an FMLA claim and the receipt of SSDI benefits. *Id*. at 498.

Turning to the case *sun judice*, the FMLA and the workers' compensation scheme begin
with similar definitions. An employee is entitled to reinstatement under the FMLA if he was
capable of performing the essential functions of his position. *See* 29 C.F.R. 825.216(c).
"Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R.
§ 1630.2(n). An employee who can perform these duties but who cannot perform the "marginal
functions of the position" is still entitled to reinstatement. *Id*. Likewise, an employee is entitled
to TTD benefits if he had "a disability which prevents [him] from returning to his former
position of employment." *Ramirez*, 69 Ohio St. 2d at 631. "'Position' is defined by Webster's
Third New International Dictionary as 'the group of tasks and responsibilities making up the

duties of an employee.'" *Id.* at 632. So far, the statutes are in direct and irreconcilable conflict: A person is eligible for FMLA relief if he can perform the core duties of his position and is eligible for TTD benefits only if he cannot.

The FMLA, however, provides that an employee who can perform the essential functions of his job is "entitled to work [his] job[] either 'intermittently or on a reduced leave schedule' when 'medically necessary.'" *Verhoff*, 299 F. App'x at 497 (quoting 29 U.S.C. § 2612(b)(1)). As noted above, this allowance has "much the same effect . . . as do the ADA's provisions" for reasonable accommodation. *Id.* at 498. In contrast, the BWC does not consider the effect of reasonable accommodations. An employee is entitled to TTD benefits until the employer (or a different employer) offers the employee work within his capabilities. *State ex rel. Crabtree v. Bureau of Workers' Compensation,* 71 Ohio St. 3d 504, 509 (Ohio 1994) (citing Ohio Rev. Code Ann. § 4123.56(A)).[9] This means that an employee could be capable of returning to his former position with accommodations for his limitations (such as an intermittent or reduced schedule) but nevertheless receive TTD benefits if no employer has actually offered him such accommodations. Because the statutes do not both take accommodations into account, an employee could be both capable of performing the essential functions of his position and too disabled to return to his position at the same time.

The Defendant challenges this conclusion by alleging that the workers' compensation statute is not all or nothing but permits claims of partial disability. In Ohio, partial disability benefits are intended to compensate employees for lost earning capacity (rather than lost wages as in TTD claims), *see State ex rel. CPC Group, General Motors Corp. v. Industrial Com.*, 53

---

[9]TTD benefits also cease if (1) the employee returns to work; (2) the employee's treating doctor states that he is capable of returning to his former position; or (3) the employee reaches his maximum medical improvement. *Crabtree*, 71 Ohio St. 3d at 509.

Ohio St. 3d 209, 211 (Ohio 1990), and are only available where the disability is permanent, *see* Ohio Rev. Code Ann. § 4123.57. This does not change the Court's conclusion that an application for *temporary total disability* benefits is not necessarily inconsistent with an interference claim under the FMLA.

The next question, then, is whether the Plaintiff has proffered a sufficient explanation for the apparently contradictory statements. The Plaintiff's assertion in this regard is that he applied for TTD benefits because he needed money and that, because the BWC never ruled in his favor, there is no inconsistency between his failed workers' compensation claim and his assertion now that he could have returned to work in March. The Plaintiff relies on the BWC's December 1, 2009, order denying his appeal because the Plaintiff "was released to return to work without restrictions" on March 13, 2009. As the Supreme Court recognized in an analogous situation, "if an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Cleveland*, 526 U.S at 805. That the Plaintiff applied for and was denied TTD benefits is consistent with his assertion now that he was able to return to work in March, and the disparity between the Plaintiff's chiropractor's reports is a question of fact for the jury. For the foregoing reasons, the Court concludes that the Plaintiff has proffered an explanation sufficient under *Cleveland*, and the Defendant's motion must be **DENIED.**

### 2. Retaliation Theory

The Defendant claims entitlement to summary judgment for the Plaintiff's FMLA retaliation claim for many of the same reasons it claimed entitlement to summary judgment for the FMLA interference claim: (1) the Plaintiff did not suffer a serious health condition; (2) he was not written off work as a result of a medical assessment by a qualified medical provider; and (3) he did not provide the Defendant with notice. The Court has already analyzed these

arguments and concluded that the Defendant's first argument is without merit but that summary judgment cannot be granted to either Party because issues of fact remain on why the Plaintiff was written off work and whether the Defendant received adequate notice; those conclusions apply equally to the Defendant's challenges to the Plaintiff's retaliation theory.

The Defendant also argues that it is entitled to summary judgment because the Plaintiff made no attempt to return to work between March 11, 2009, and March 17, 2009. The Defendant, however, cites no law showing that such an attempt is required. Regardless, the Plaintiff has testified that he was waiting for his assignment from Tina Monroe; Kay Evans has testified that she received the March 13, 2009 return-to-work form; and the evidence shows that the Plaintiff received notice of termination on March 16, 2009, the Monday after he or his chiropractors faxed the return-to-work form. The evidence, therefore, could be interpreted to mean that the Plaintiff attempted to return to work by calling Evans and that he was fired before any further attempts could have been made. The Defendant's argument that it is entitled to summary judgment because the Plaintiff did not attempt to return to work is unsupported by the law or the record.

The Defendant additionally argues that the Plaintiff cannot prevail under a retaliation theory because there is no evidence of retaliation. Under the retaliation theory, the Plaintiff must show that the Defendant discriminated against him because he took FMLA leave or that the Defendant "'use[d] the taking of FMLA leave as a negative factor in [an] employment action[].'" *Arban*, 345 F.3d at 403 (quoting 29 C.F.R. § 825.220(c)); *see also Mitchell v. County of Wayne*, 337 F. App'x 526, 534 (6th Cir. 2009) ("A retaliation theory of recovery under the FMLA is different from an interference theory because under a retaliation theory, the intent of the employer matters."). The Plaintiff attempts to meet his burden by pointing to the termination letter and the temporal proximity between his termination and his leave.

The Plaintiff may prove his claim for retaliatory discharge using either direct or circumstantial evidence. Direct evidence of retaliation  "'does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part" by retaliation for the exercise of a protected activity. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). In other words, direct evidence is that in which the employer "explicitly expresse[s]" a retaliatory motive. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). When a plaintiff produces direct evidence of discrimination, the "'burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (quoting *DiCarlo*, 358 F.3d at 415).

The Court concludes that the termination letter is direct evidence of retaliation. The body of the letter, which is addressed to the Plaintiff, reads in full as follows:

> Mt. Perry Foods, Inc. had to hire a new driver after your chiropractic doctor notified the company that Mr. McDonald had to be reassigned to a light duty job at the plant.
>
> On January 5, 2009, Mt. Perry Foods Company assigned him to a job that is just about the lightest it had-prepare cookie size waffles to bake, take them off cooking trays, etc, none of which weighing more than a few pounds at the most. Normally they are a few ounces.
>
> We discovered that he left his job after a couple of hours.
>
> We found out that he went to his chiropractor office complaining about severe pains in the neck and back. A notice was faxed to Mt. Perry office. When the company production superintendent and Mr. McDonald line supervisor read the facts they found certain discrepancies. They contacted his chiropractic doctor, but took a long time before locating him. The chiropractic doctor was not even in the office when Mr. McDonald came to the office. His chiropractic doctor and Mt. Perry Foods general manager/V.P. discussed the fax contents, and the doctor had adjusted the treatment called for and the length of the treatment.
>
> By this time it became obvious that Mt. Perry Foods had to hire a new driver

-25-

replacing Mr. McDonald and we did.

There is no longer his old position open.

We discharged him as of March 16, 2009.

This letter states that Mt. Perry hired a new driver because of one or all of the following reasons: (1) the Plaintiff required a light duty assignment; (2) the chiropractor's representation of the Plaintiff's current and/or future limitations; and (3) the fact that the Plaintiff left work on January 5, 2009. All three of these reasons relate to the Plaintiff's need for FMLA leave. Because it is clear from the letter that the fact that the Defendant hired a replacement for the Plaintiff was at least one of the reasons for the discharge, the letter, on its face, shows that there was a causal link between the Plaintiff's need for FMLA leave and his termination. This is direct evidence of retaliation. *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996) (in analogous ADA context, defendant's statement that relied on plaintiff's disabled status when deciding to hire a replacement was direct evidence of retaliation).

The burden therefore shifts to the Defendant to show by a preponderance of the evidence that it would have fired the Plaintiff even if he had not taken FMLA leave. This the Defendant has not done. The Defendant's only contention is that it fired the Plaintiff because he walked off the job and never returned. This contention is based on its premise that it did not receive adequate notice of the Plaintiff's intention to take FMLA leave, but, as the Court has already explained, there is evidence in the record from which a reasonable juror could conclude that the Defendant did have that notice. With notice that the Plaintiff was on FMLA leave, the Defendant's argument that it fired the Plaintiff for his absence from work is inextricably related to the Plaintiff's leave. The Defendant simply has not shown any independent reason why the Defendant fired the Plaintiff, and summary judgment cannot be granted in its favor. On the other hand, if the Defendant did not have notice of the Plaintiff's need for FMLA leave, then its

decision to fire the Plaintiff for his absences could be construed as a non-retaliatory motive. For this reason, summary judgment also cannot be granted to the Plaintiff. The Court accordingly **DENIES** both Parties' motions on the FMLA retaliation claim.

### C. Ohio Workers' Compensation Act

The Plaintiff alleges that the Defendant violated the Ohio Workers' Compensation Act when it terminated his employment, allegedly in retaliation for filing a workers' compensation claim. The statute states:

> No employee shall discharge . . . any employee because the employee filed a claim or instituted, pursued or testified in proceedings under the workers' compensation act for an injury . . . which occurred in the course of and arising out of his employment with that employer.

Ohio Rev. Code Ann. § 4123.90.

In this case, there is no direct evidence that the termination was in retaliation for filing a workers' compensation claim. In the absence of direct evidence, the following procedure applies: (1) the plaintiff must establish a prima facie case of retaliation; (2) the burden then shifts to the employer to articulate a legitimate nonretaliatory reason for the discharge; and (3) the burden then shifts back to the plaintiff to prove that the reason offered by the employer is pretextual and that the real reason for the discharge was the employee's protected activity under the Ohio Workers' Compensation Act. *Davison v. Roadway Express, Inc.*, 562 F.Supp. 2d 971, 982 (N.D. Ohio 2008); *Kilbarger v. Anchor Hocking Glass Co.*, 697 N.E.2d 1080, 1083-84 (Ohio Ct. App. 1997).

### 1. Prima Facie Case

To establish a prima facie case of retaliation under § 4123.90, the Plaintiff must show the following: (1) he was injured on the job; (2) he filed a workers' compensation claim; and (3) there was a causal connection between his filing of the workers' compensation claim and his

termination. *See Wilson v. Riverside Hosp.*, 18 Ohio St.3d 8, 10 (1985); *Davison*, 562 F.Supp. 2d at 982.

The Defendant argues that it is entitled to summary judgment because the Plaintiff has not met his burden of showing that there was a causal connection between his workers' compensation claim and his termination. It does not dispute that the Plaintiff was injured on the job or that he filed a workers' compensation claim.

An employee alleging retaliatory discharge under § 4123.90 must show that the employer terminated him "'because of his pursuit of a workers' compensation claim'" and "'not because of his job-related injury.'" *Dover v. Carmeuse Natural Chems.*, 2010 Ohio 5657, at *P39 (Ohio Ct. App. 2010) (quoting *Blair v. Milford Exempted Village School Dist. Bd. of Edn.*, 62 Ohio App.3d 424, 431 (Ohio Ct. App. 1989)). The employee "must produce evidence sufficient to raise an inference that the filing of the workers' compensation claim was the likely reason for the adverse employment action." *Id.* at *P47. Temporal proximity may be a factor, but "alone it is insufficient to show a causal link." *Id.*

The Plaintiff rests his case on two facts: first, that the Defendant had an incentive program that discouraged injured workers' from filing workers' compensation claims, suggesting a general hostility to such claims; and, second, that the temporal proximity between his filing of a workers' compensation claim and his termination suggests retaliatory motive. First, the record does not support the Plaintiff's interpretation that the Defendant had a policy of discouraging its employees from filing workers' compensation claims. It is undisputed that the Defendant had a program in which it paid the first $1,000 of its injured employees' medical expenses outside of the workers' compensation scheme; the purpose of the program was to keep the Defendant's workers' compensation premiums low. The Defendant has offered evidence that this program was part of the "$15K Program" run by the BWC. Payments under the program are not

conditioned upon an employee waiving his rights to workers' compensation, and the Plaintiff has not offered any evidence that this or any other program created an incentive for employees to waive their rights. The Defendant's participation in the $15K program therefore does not raise the inference of retaliation.

The Plaintiff is left, then, only with temporal proximity. The Ohio Supreme Court has yet to resolve whether temporal proximity may support a prima facie case of retaliation without other supporting evidence, but Ohio's lower courts have concluded that "temporal proximity alone is insufficient to establish a prima facie case of retaliatory discharge" based on the filing of a workers' compensation claim. *See, e.g., Young v. Stelter & Brinck, Ltd.*, 174 Ohio App. 3d 221, 226 (Ohio Ct. App. 2007) (concluding that fact that employee was fired days after filing his workers' compensation claim was not enough alone to establish employee's prima facie case); *Cunningham v. Steubenville Orthopedics & Sports Med., Inc*., 175 Ohio App. 3d 627, 642 (Ohio Ct. App. 2008) ("[T]emporal proximity alone is insufficient to support a finding of a causal connection"); *Dover*, 2010 Ohio at *P39 (same); *Buehler v. Ampam Commer. Midwest*, 2007 Ohio 4708, at *P25 (Ohio Ct. App. 2007) (same). *But cf. Wysong v. Jo-Ann Stores, Inc*., 2006 Ohio 4644, at *P26 (Ohio Ct. App. 2006) ("Mere temporal proximity between an employee's protected activity and an adverse employment action *typically* is insufficient to support an inference of retaliation.") (emphasis added). In the absence of controlling law from the Ohio Supreme Court, this Court is tasked with predicting what the Supreme Court "would decide if faced with the issue." *Ziegler v. IBP Hog Mkt., Inc*., 249 F.3d 509, 517 (6th Cir. 2001).

Although the Court must look to "all available data," it "may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id*. The Court is neither aware of any Ohio Court of Appeals case holding that temporal proximity alone is sufficient to establish causation nor of any

other "persuasive data" suggesting that the Ohio Supreme Court would break with its lower courts. It therefore must conclude that temporal proximity alone is not sufficient to support the Plaintiff's prima facie case, and the Defendant's motion for summary judgment must be **GRANTED**.

### D. Ohio Public Policy

Both Parties have moved for summary judgment on the Plaintiff's claim that the Defendant violated Ohio public policy when it retaliated against the Plaintiff for filing a workers' compensation claim. Their central argument is on the effect of *Bickers v. W. & S. Life Ins. Co.*, 116 Ohio St. 3d 351 (Ohio 2007), which addressed the availability of the tort of wrongful discharge in violation of public policy for claims based on retaliation for the filing of a workers' compensation claim. As stated in the syllabus of the court, *Bickers* stands for the following proposition: "An employee who is terminated from employment while receiving workers' compensation has no common-law cause of action for wrongful discharge in violation of the public policy underlying R.C. 4123.90, which provides the exclusive remedy for employees claiming termination in violation of rights conferred by the Workers' Compensation Act." *Id.* at 351.

The Plaintiff attempts to distinguish *Bickers* by relying on discrepancies between the case's syllabus, which announces a sweeping bright-line rule, and its body, which appears to have a more limited scope, but this attempt is unsuccessful. According to Rule 1(B)(2) of the Ohio Supreme Court Rules for the Reporting of Opinions, "[i]f there is a disharmony between the syllabus of an opinion and its text or footnotes, the syllabus controls." Even if the Court agreed with the Plaintiff's interpretation of the body of *Bickers*, it would be obligated under this rule to apply the holding as stated in the syllabus.

For this reason, Ohio Courts have consistently held that *Bickers* forecloses public policy

claims based on termination as retaliation for filing a workers' compensation claim.[10] *E.g.*,

*Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St. 3d 280, 289–90 (Ohio 2010)

(citing *Bickers* as an example of the compromise in workers' compensation law where

"[e]mployers . . . give up common-law defenses but are protected from unlimited liability");

*Mortensen v. Intercont'l Chem. Corp.*, 178 Ohio App. 3d 393, 398 (Ohio Ct. App. 2008) (citing

*Bickers* for the conclusion that a plaintiff may not pursue both statutory and common law claims

for discharge as retaliation for filing workers' compensation claim); *Sidenstricker v. Miller*

*Pavement Maint., Inc.,* 2009 Ohio 6574, at *P12–P13 (Ohio Ct. App. 2009) ("We note the

substantial differences in the facts of appellant's case from those of the *Bickers* case. . . .

However, we are not at liberty to overrule the syllabus of a Supreme Court opinion which is on

point on the determinative legal issue.").

      Likewise, every district court in this Circuit that has considered the issue has ruled that

*Bickers* eliminates the availability of the public policy tort for claims based on retaliation over

filing a workers' compensation claim. *See Sharp v. Honda of Am. Mfg.*, No. 2:10-cv-1039, 2011

U.S. Dist. LEXIS 21909, at *2 (S.D. Ohio Mar. 4, 2011); *Amara v. ATK, Inc.*, No.: 3:08CV0378,

2009 U.S. Dist. LEXIS 76357, 8-9 (S.D. Ohio Aug. 5, 2009) (noting "Ohio appellate courts have

interpreted *Bickers* to ban all retaliatory common law claims for wrongful discharge in violation

of public policy"); *Helmick v. Solid Waste Auth. of Cent. Ohio*, No. 2:07-CV-912, 2009 U.S.

Dist. LEXIS 19301, at *12 (S.D. Ohio Mar. 10, 2009); *Trout v. FirstEnergy Generation Corp.*,

No. 3:07CV00673, 2008 U.S. Dist. LEXIS 102803, at *15 (N.D. Ohio Aug. 6, 2008); *Compton*

---

[10]One Ohio appellate court has carved out an exception to *Bickers* for cases in which an employer fires an employee "so quickly" after that employee's incursion of a work-related injury that the employee "has no reasonable opportunity to file a claim or institute proceedings under the Workers' Compensation Act." *Sutton v. Tomco Machining, Inc.*, 186 Ohio App. 3d 757, 764 (Ohio Ct. App. 2010). That exception is inapplicable to the case at bar.

*v. Swan Super Cleaners, Inc*., No. 08-CV-002, 2008 U.S. Dist. LEXIS 39526, at *13–14 (S.D. Ohio Apr. 29, 2008); *McDermott v. Cont'l Airlines, Inc*., No. 2:06-cv-0785, 2008 U.S. Dist. LEXIS 29831, at *46 (S.D. Ohio Apr. 11, 2008) (noting that "it is questionable whether Ohio recognizes" a tort for wrongful discharge due to filing of workers' compensation claim).

The Ohio courts and federal courts applying Ohio law are in agreement regarding *Bickers'* effect on claims for retaliatory discharge following the filing of a workers' compensation claim, and the Court accordingly **GRANTS** summary judgment in favor of the Defendant on the Plaintiff's Ohio public policy claim.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Plaintiff's Motion for Summary Judgment (Doc. 17), and **GRANTS** in part and **DENIES** in part the Motion of Defendant for Summary Judgment (Doc. 18). Specifically, the Court **GRANTS** summary judgment in favor of the Defendant only on the Plaintiff's Ohio workers' compensation retaliation claim and the Plaintiff's wrongful discharge in violation of public policy claim.

**IT IS SO ORDERED.**

**s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: August 2, 2011**